IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rebecca Schmersal,                       Case No. 3:09 CV 2333

                Plaintiff,             MEMORANDUM OPINION
                                                    AND ORDER
     -vs-
                                                    JUDGE JACK ZOUHARY

Pamela Major, et al.,

                Defendants.

### INTRODUCTION

Plaintiff Rebecca Schmersal brought this action against Pamela Major, former University of Toledo Medical Center ("UTMC") Nursing Director, in her individual capacity, and Connie Rubin, the UTMC Labor Relations Director and "appointing authority," in her official capacity (Doc. Nos. 1 and 8). Plaintiff alleges Defendants violated her First Amendment free speech rights and retaliated against her for speaking out on matters of public concern. Defendants filed a Motion for Summary Judgment and/or Qualified Immunity (Doc. No. 22); Plaintiff opposed (Doc. Nos. 23, 27); and Defendants replied (Doc. No. 25).

### BACKGROUND

Plaintiff was a Patient Care Aide at UTMC from October 2002 to June 2008 (Doc. No. 1, p. 1). Plaintiff was terminated on June 25, 2008 for insubordination and lack of good behavior (Doc. No. 1, p. 3). Plaintiff claims her termination was in retaliation for two statements she made, one on October 24, 2006 and one on June 4, 2008 (Doc. No. 1, p. 3). Plaintiff claims both of these statements were protected by the First Amendment as speech on matters of public concern. Accordingly,

Plaintiff claims Defendants violated her Constitutional rights by retaliating against her for making these statements, culminating in Plaintiff's termination (Doc. No. 1, pp. 3-4).

### October 24, 2006 Statement

The challenged October 24, 2006 statement was a letter written by Plaintiff and faxed to the Ohio Board of Nursing. In the letter, Plaintiff recounted an incident that occurred on October 17, 2006. Plaintiff was asked by a UTMC registered nurse to increase the oxygen level for a patient in distress. Plaintiff responded by saying: "I am not allowed to increase the oxygen levels on patients, it is not in my job description to do that." The nurse, now agitated, allegedly yelled at Plaintiff to turn up the oxygen "[n]ow before he crashes!" Plaintiff adjusted the oxygen though she believed it was against Ohio Board of Nursing standards to do so. Simultaneously, the nurse was setting up a blood pressure monitor for the patient. Plaintiff asked to change positions with the nurse because blood pressure monitoring setup is in her job description. The nurse denied Plaintiff's request. According to the nurse, the patient allegedly asked "What was her problem, was she going to let me die?" after Plaintiff left the room (Doc. No. 18-17, Ex. 14).

Plaintiff's letter described the above incident as part of the "hostile environment" she faced every day at UTMC. The letter also stated that Plaintiff believed that "follow[ing] the book" while providing care was important and that she will continue to follow state guidelines for Patient Care Aides (Doc. No. 18-17, Ex. 14).

On October 20, following the incident but before Plaintiff faxed her letter on October 24, Plaintiff met with the UTMC Assistant Director of Nursing, Christine Brynzynski, and Plaintiff's union steward, registered nurse Marilyn Ritter. At this meeting, Plaintiff was reminded that (1) oxygen is not a dangerous drug; (2) she needed to follow the nurses' instructions; and (3) she had

signed a competency sheet that acknowledged the use of oxygen within the job description of a Patient Care Aide. Ritter advised that she would recommend discipline if she was Plaintiff's supervisor (Doc. No. 21-3, p. 1).

On October 23, Plaintiff received a call from Ritter. Plaintiff was told that UTMC wanted to impose discipline for insubordination based on her initial refusal of the nurse's request to turn up the oxygen. An investigatory meeting was held on October 26 to discuss Plaintiff's actions and the propriety of having a Patient Care Aide change oxygen settings. Plaintiff does not recall receiving any discipline for the October 20 incident (Doc No. 21-1, Transcript ("Tr.") p. 36-47).

Additionally, because Plaintiff was unhappy with Ritter as her union steward, Plaintiff chose Thomas Kosek, the union president, to represent her in the future. Plaintiff showed Kosek the letter she sent to the Board of Nursing on October 24. Kosek later testified "that she had filed the complaint with the board of nursing in relationship to the discipline that she had received, and this was her way of telling me that she had taken this to another step in the process" (Doc. No. 20, Tr. p. 10).

Plaintiff argues that by sending the letter, she was speaking as a citizen on patient care, a matter of public concern. The letter complained of the "hostile environment" she faced on a daily basis (Doc. No. 21-3, p. 2), yet Plaintiff later testified she contacted the Board of Nursing because she "wanted to speak out . . . as a citizen of Lucas County" based on her concern of providing safe patient care in accordance with the Board's guidelines (Doc. No. 21-1, Tr. p. 39). Plaintiff argues that any retaliation that flows from this letter is therefore a violation of her First Amendment right to free speech under *Connick v. Myers*, 461 U.S. 138, 146 (1983) (Doc. No. 27, p. 8). Defendants argue Plaintiff sent the letter in response to, and to defend against, disciplinary charges (Doc. No. 22, p. 3).

3

**June 4, 2008 Statement**

The June 4, 2008 statement, which Plaintiff claims resulted in retaliation, occurred during an investigatory meeting to discuss possible discipline. Several days before that meeting, union president Kosek received an email from then-Nursing Director Pamela Major stating: "I need to have an investigational [meeting] with Rebecca [Schmersal]. When can we meet? I have 2 issues and I plan to move forward in discipline!" (Doc. No. 20-22, Ex. 37).

The June 4 meeting was attended by Plaintiff, Defendant Major, Kosek, Manager of Employee and Labor Relations Linda Torbet, and chief union steward Sue Davis. The meeting was called for management to express its concerns regarding some of Plaintiff's actions and for Plaintiff to explain her actions. Several issues were addressed (Doc. No. 20-1, Tr. p. 47; Doc. No. 19, Tr. pp. 13-14; Doc. No. 18, Tr. pp. 22-23; Doc No. 20, Tr. pp. 8-9).

Three issues discussed were discipline-related. First was Plaintiff's refusal to empty and record urine output from a patient's catheter after being directed by the charge nurse on May 25, 2008 (Doc. No. 18, Tr. p. 21). Plaintiff was ultimately terminated on June 25, 2008 based on this insubordination which was preceded by five prior disciplinary warnings (Doc. No. 18-9, Ex. 6).

The second issue involved Plaintiff's incorrect recording of blood sugar levels for two patients on May 29, 2008. Plaintiff allegedly switched the numbers for the two patients. Plaintiff was issued a written warning. The discipline form also noted additional prior disciplinary actions (Doc. No. 18-7, Ex. 4).

The third issue involved a conversation Plaintiff allegedly had with a patient on May 29, 2008. The patient was unhappy that the dressing on an injury was not being promptly changed by the nurse. In response, Plaintiff allegedly suggested the patient "write up" the nurse (Doc. No. 18, Tr.

4

p. 23). Plaintiff was given a Pre-Discharge/Written Warning with an optional unpaid suspension as discipline. The discipline form listed a number of prior insubordination warnings and patient-related complaints dating back to April 2006 (Doc. No. 18-8, Ex. 5).

Another issue allegedly raised at the meeting involved the actions by Plaintiff and several UTMC nurses who responded to a patient death. Defendant Major read from a complaint written by nurse Carrie Short. The complaint alleged Plaintiff was the Patient Care Aide assigned to assist a terminally ill patient; Plaintiff had difficulties obtaining a blood pressure reading and called for assistance from the nursing staff, including Short; the patient, who was being treated in compliance with a Do Not Resuscitate order, died shortly thereafter. Later, in reference to another patient, Short alleged in the complaint that Plaintiff made the statement "Carrie better get in here before something else happens to one of her patients," referring to the earlier incident in which Plaintiff did not get immediate assistance from Short or other nurses. Short was unsure whether Plaintiff's comment was made within earshot of a patient, but felt the comment was inappropriate in any event (Doc. No. 21, Tr. pp. 9-12; Doc. No. 18-18, Ex. 15).

Following Defendant Major's reading of the complaint, Plaintiff alleges she thought she was going to be disciplined for what she said. In response, Plaintiff addressed the meeting participants and "spoke for five to eight minutes as to what happened" (Doc. No. 21, Tr. pp. 9-14; Doc. No. 21-7, Ex. 39, p. 4). Plaintiff later testified that she spoke on behalf of patient safety in her role as a citizen (Doc. No. 21, Tr. Pp. 9-14). No recordings or detailed notes of Plaintiff's "speech" appear in the record, and her comments were not discussed. The written complaint was placed in Plaintiff's personnel folder, and the meeting concluded (Doc. No. 21-2, Tr. p. 62).

5

**STANDARD OF REVIEW**

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, a court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, a court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

**ANALYSIS**

**First Amendment Protected Speech and Retaliation**

In free-speech retaliation cases arising in the employment context, the court asks three questions. First, was the individual involved in "constitutionally protected" activity -- here, activity protected by the free speech clause of the First Amendment? *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Second, would the employer's conduct discourage individuals of "ordinary firmness" from continuing to do what they were doing? *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). And third, was the employee's exercise of constitutionally protected rights "a motivating factor" behind the employer's conduct? *Mt. Healthy*, 429 U.S. at 287. Plaintiff must prove each point to prevail. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village*, --- F.3d ----, 2010 WL 4117286 (6th Cir. 2010).

*Protected Speech*

In order to answer the first question, the Supreme Court has outlined three requirements a First Amendment claimant must show to demonstrate protected speech: the *Connick* "matters of public concern," the *Pickering* "balancing," and the *Garcetti* "pursuant to" requirements.

The "matters of public concern" requirement. The First Amendment protects the speech of employees only when it involves "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983). Whether the speech at issue involves a matter of public concern is a question of law for the court. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). In *Connick*, the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146. When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.* Furthermore, under *Connick*, the question is whether the speech "more closely resembled an employee's complaints regarding his superior's actions and his own responsibilities as a[n] [employee] than a citizen's speaking out on a matter of public decisionmaking." *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988).

The "balancing" requirement. If the employee establishes that her speech touches upon "matters of public concern," a balancing test determines whether the employee or the employer prevails. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). In *Pickering*, the Court "balance[d] . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interest of the [employer], in promoting the efficiency of the public services it performs through its employees." *Id.* When there is no relationship between the content of the employee's

7

speech and the "proper performance of [the employee's] daily duties," the employer's interests do not outweigh the employee's desire to "contribute to public debate" like any other citizen. *Id.* at 572-73.

<u>The "pursuant to" requirement.</u> If the court finds that the employee's speech relates to a matter of "public concern" under *Connick*, and that the *Pickering* balancing requirement favors the employee, the court must still find that the First Amendment applies to the employee's speech. The Supreme Court in *Garcetti* stated, "The controlling factor is [whether the employee's] expressions were made pursuant to his duties as a[n] [employee]," in determining whether the relevant speaker was the employer and not the individual. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

Applying the requirements when considering Plaintiff's two statements, this Court is persuaded that no genuine issue of fact exists that would result in Plaintiff's statements being deemed to have been protected speech under the First Amendment.

First, Plaintiff's two statements, while being couched in allegations that the statements were made out of concern for the quality of health care delivered to Lucas County residents, do not rise to the level of "matters of public concern." Other courts have stated that "matters of public concern" normally involve statements regarding issues that would affect the community at large or would allow a public employee to speak on issues that would inform the public that a public entity, such as UTMC, was failing to discharge its responsibilities in a timely or acceptable manner. *See Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001); *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003).

8

An example of what does and does not rise to the level of a matter of public concern was discussed in a 1999 case involving Medical College of Ohio ("MCO"), the entity that eventually became UTMC.  In *Jackson v. Leighton*, 168 F.3d 903 (6th Cir. 1999), the court noted that a hospital chairman's comments related to a proposed merger of MCO did address matters of public concern because such a merger threatened the existence of MCO, thereby affecting the availability of healthcare services to the Toledo, Ohio area. *Id.* at 910-11.  However, the court went on to distinguish other statements by the chairman, that were not protected, such as a letter sent to the MCO trustees expressing concerns about certain merger proposals and statements about the chairman's lack of confidence in some individuals involved in the negotiations.  The court noted that these other statements were more akin to matters of personal interest, internal office politics, and amounted to "nothing more than an example of the 'quintessential employee beef' of incompetent management." *Id.* at 910-11 (citations omitted).

In her Opposition, Plaintiff cites a variety of cases where medical employees' speech has been protected as a matter of public concern.  Those cases, however, are distinguishable from Plaintiff's statements.  Each of the cited cases deals with issues in medical facilities that are far beyond allegations of failure to follow a specific care protocol. For example, *Paradis v. Montrose Mem'l Hosp.*, 157 F.3d 815 (10th Cir. 1998), dealt with allegations of insurance fraud and sex and religious discrimination in connection with patient care.  *Frazier v. King*, 873 F.2d 820 (5th Cir. 1989), involved allegations of denial of care to a number of patients and nurses prescribing care and treatment as if they were licensed physicians. In *Getz v. Bd. of Cnty. Com'rs*, 194 F. Supp. 2d 1154 (D. Kan. 2002), a nurse's comments were found to be a matter of public concern when she voiced complaints about deficiencies in providing medical care to inmates, including denials of treatment and

9

medication, dispensing medication without physicians' orders, and an insufficient number of nurses to adequately care for the inmate population.

These cases involving widespread allegations of failure to provide appropriate medical care are not applicable to Plaintiff's claims. Instead Plaintiff's claims are similar to the chairman's personal comments in *Jackson*. Plaintiff's statements, read broadly, reflect her disagreement with her supervising nurses' decisions, and tactical individual treatment decisions, not matters of public concern. The letter to the Ohio Board of Nursing focuses only on Plaintiff's claimed "hostile work environment" and vague allegations of nurses' failure to follow procedures. Notably, the letter did not allege broad violations of unsafe conditions that threatened UTMC patient health, but rather whether a Patient Care Aide was allowed to change oxygen levels under the Board's regulations. Plaintiff's statement at the June disciplinary meeting also failed to allege systemic failure of UTMC nurses to provide adequate care -- something that would likely be of general public concern. Instead, her statement was made in a disciplinary context, in defense of her own inappropriate comment, that was itself a product of her own personal observations of how her supervising nurses were carrying out their duties. While Plaintiff may have had an individual concern with how nurses were performing their duties, this statement appears to "nothing more than an example of the 'quintessential employee beef' of incompetent management." *Jackson*, 168 F.3d at 910-11.

Second, Plaintiff's free-speech retaliation claims must fail when considered under the *Pickering* balancing requirement. Certainly UTMC's interests in allowing its nurses to provide emergency care for patients, provided the delivery of care is reasonable, outweighs the interest of Plaintiff to exercise her disagreement of whether a certain care instruction is properly within her job description.

10

Furthermore, UTMC's ability to conduct hearings to discipline employees for insubordination, which may include allowing the employee to speak on his or her own behalf, cannot, at least in this case, give rise to a claim of free-speech retaliation. This is particularly true here where Plaintiff had a history of insubordination. While Plaintiff may feel as though she was terminated, in part, based on her statement at the June meeting, the balancing of interests weighs strongly in favor of UTMC's orderly and efficient delivery of medical services, including its ability to conduct employee disciplinary meetings and take appropriate disciplinary action. *See Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (allowing broad discretion to public employers in carrying out their operations because "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.").

Third, Plaintiff fares no better under the *Garcetti* "pursuant to" requirement. The statement by the Court in *Garcetti* was clear: when employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. *Garcetti*, 547 U.S. at 421. Here, both of Plaintiff's statements were directly related to what she perceived to be her official duties and whether the directions she was given by the supervising nurse fell within her job description. Each of Plaintiff's statements was considered inappropriate by UTMC who imposed discipline. Under *Garcetti*, this Court cannot now choose to insulate Plaintiff's comments under the shield of the First Amendment.

Even if Plaintiff's claims survived the "matter of public concern," "balancing," and "pursuant to" requirements to prevail on the first point in this free-speech retaliation case, there is no genuine issue of fact with respect to the remaining two points. With respect to the second point, there is no evidence that UTMC's conduct would discourage similar individuals of "ordinary firmness" from taking the actions Plaintiff attempted to take. It is unclear why, other than attempting to intimidate those individuals involved in potentially disciplining her, Plaintiff sent the letter to the Ohio Board of Nursing. As stated by Plaintiff's union president, Plaintiff filed the complaint with the Board of Nursing as an attempt to escalate her concerns in connection with the discipline she expected to receive (Doc. No. 20, Tr. p. 10).

Additionally, the Ohio Board of Nursing has no statutory power to regulate Patient Care Aides, as the Board's powers are primarily directed towards nurse licensure, certification, training, and practice improvement. O.R.C. § 4723 *et seq.* While one section of the Code provides a process by which the Board can investigate a nurse that is practicing unsafely, Plaintiff's letter does not claim that the nurse's request to turn up the oxygen was in any way unsafe. O.R.C. § 4723.28; Doc. No. 21-3. Instead Plaintiff's letter claims she faced a "hostile environment" at UTMC and that she believed Patient Care Aides were not permitted to adjust oxygen levels per the Board's guidelines. There simply is no issue of material fact as to whether UTMC's actions would discourage other Patient Care Aides from taking similar actions.

Furthermore, there is no genuine issue of material fact with respect to whether Plaintiff's alleged exercise of her free-speech rights was "a motivating factor" behind UTMC's conduct. Plaintiff's discipline history reveals a number of prior warnings, complaints, and a suspension for Plaintiff's prior acts at UTMC. Some of these prior disciplinary actions were taken for substantially

12

the same reason that led to the circumstances surrounding the two statements at issue in this case -- insubordination (Doc. No. 18-7, Ex. 4; Doc. No. 18-8, Ex. 5; Doc. No. 18-18, Ex. 15). Any or all of these prior disciplinary actions, taken separately or in combination, provide more than adequate support for Plaintiff's termination.

**Qualified Immunity**

Defendants also argue, independent of whether Plaintiff's speech was protected by the First Amendment, that Defendants would be entitled to qualified immunity for their actions in terminating Plaintiff. This Court agrees.

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), held "if the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202. The Court has further spelled out how a district court is to examine this issue: "[f]irst, a court must decide whether the facts that a plaintiff has alleged (see [Federal Civil Rule] 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Saucier*, 533 U.S. at 201. Second, the court must decide whether the right at issue was "'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 815-16 (2009) (citation omitted). This two-step analysis can be made in any order. *Id.* at 818.

This Court is required to examine the asserted right at a relatively high level of specificity. The right must have been "clearly established," not just in an abstract sense, but in a "particularized" sense. *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997) (citation omitted). That is, Defendants' claims of immunity are to be analyzed "on a fact-specific, case-by-case basis to determine whether

a reasonable official in the defendant[s'] position could have believed that [their] conduct was lawful. . . ." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995).

Here, Defendants Major and Rubin were both working within their designated responsibilities as employees of UTMC, a publically owned and operated medical school under the auspices of the University of Toledo, a state university. *See* About UTMC, *available at* http://utmc.utoledo.edu/patientguests/aboututmc.html. Based on the record facts, there is no reasonable argument that either Major or Rubin would have believed their conduct that led to the termination of Plaintiff was in violation of a "clearly established" constitutional right, nor has Plaintiff put forth any evidence that Defendants were on notice that they were violating Plaintiff's rights. Plaintiff had a documented history of disciplinary problems and, while Plaintiff may have had the right to speak up in her own defense in response to disciplinary charges, Defendants Rubin and Major had ample reason to believe they were justified in recommending Plaintiff's termination independent of Plaintiff's statements. Thus, Defendants are entitled to a qualified immunity defense in response to Plaintiff's First Amendment claims.

## CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

November 30, 2010